IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DAMIAN MARINE, )
)
           Petitioner, ) C.A. No. 08-333 Erie
)
v. )
) District Judge McLaughlin
FRANCISCO J. QUINTANA, ) Chief Magistrate Judge Baxter
)
           Respondent. )

# MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

**I.    RECOMMENDATION**

It is recommended that the Petition for Writ of Habeas Corpus filed by Petitioner, federal inmate Damian Marine, be denied.

**II.    REPORT**

On December 2, 2008, Petitioner filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241. He contended that the Bureau of Prisons (the "Bureau") denied him due process in disciplinary proceedings that commenced on July 16, 2008, with the filing of Incident Report No. 1765105. The Incident Report charged him with violating a condition of the Brooklyn, New York, Community Corrections Center ("CCC").[1] It also charged him with forging or altering documents that he submitted to the CCC. Following a disciplinary hearing, Petitioner was found to have violated a condition of the CCC and as a sanction he was transferred to the Federal Correctional Institution, McKean ("FCI McKean"), located in Bradford, Pennsylvania, and he lost 13 days of good conduct time.

As set forth in more detail below, prior to the disciplinary hearing Petitioner had been provisionally scheduled to be released from Bureau custody on October 6, 2008, a date that was approximately eight months earlier than his sentence otherwise would have expired. The Bureau had provisionally determined that it would release Petitioner early pursuant to its authority under 18 U.S.C.

---

[1] CCCs are commonly referred to as halfway houses. They are also know as Residential Re-entry Centers ("RCC").

1

§ 3621(e)(2)(B). However, after Petitioner was found to have violated a condition of the CCC and was transferred to FCI McKean, the Bureau revoked his provisional release date of October 6, 2008, and it recalculated his sentence without § 3621(e)'s early release benefit. This resulted in Petitioner's release date being moved back approximately eight months, to July 1, 2009.

On January 15, 2009, the Bureau's Central Office granted Petitioner's administrative challenge to his disciplinary proceeding. The Bureau expunged the Incident Report, restored to him 13 days of good conduct time, and directed that he be transferred back to the CCC. With the restoration of the good conduct time, Petitioner is now scheduled to be released on June 20, 2009. Petitioner wants the Bureau to release him immediately. The Bureau will not do so because it has determined that he is no longer eligible for any early release under § 3621(e), and therefore his sentence expires on June 20, 2009.

Petitioner primarily seeks an order from this Court directing the Bureau to immediately release him from its custody. The Court has no authority to grant him the relief that he requests, and therefore his petition for writ of habeas corpus must be denied.

### A.     **Relevant Factual and Procedural History**

In 2005, Petitioner was sentenced in the United States District Court for the Southern District of Florida to a 57-month term of imprisonment, to be followed by a 3-year term of supervised release, for Importation of Heroin and Possession With Intent to Distribute Heroin, in violation of 21 U.S.C. §§ 952(a) and 841(a)(1). The Bureau designated him to FCI McKean. It calculated his 57-month term of imprisonment to have commenced on June 4, 2005, pursuant to 18 U.S.C. § 3585(a). With the subtraction from his term of imprisonment of 33 days of prior custody credit (pursuant to 18 U.S.C. § 3585(b)) and his projected good conduct time of 223 days (pursuant to 18 U.S.C. § 3624(b)), his sentence was set to expire on or around June 20, 2009. (See *Inmate Data*, Docket No. 20, Ex. 3a).

    **1.**     **Petitioner Receives a Provisional Early Release Date Pursuant To 18 U.S.C. § 3621(e)**

So that the Bureau may provide to inmates an incentive to participate in substance abuse treatment while in its custody, Congress vested the Bureau with the authority to reduce the sentences

of certain inmates who successfully complete the Bureau's Residential Drug Abuse Program ("RDAP").

This authority is set forth in 18 U.S.C. § 3621(e)(2)(B), which provides:

> **Period of Custody**. . . The period a prisoner convicted of a nonviolent offense remains in custody *after successfully completing a treatment program may be reduced by the Bureau of Prisons*, but such reduction may not be more than one year from the term the prisoner must otherwise serve.

(Emphasis added).

The Bureau's Program Statement,[2] 5330.10, <u>Drug Abuse Programs Manual</u>, explains at § 5.2.1:

> *The entire residential drug abuse treatment program in the Bureau consists of three components. Successful completion of the residential drug abuse program occurs when the inmate has successfully completed each of these three components*:
>
> ▪ the unit-based residential program lasting between six-to-12 months (minimum 500 hours);
>
> ▪ the institution transition phase, which requires participation for a minimum of one hour a month over a period of 12 months after successfully completing the unit-based program (however, if an inmate is scheduled for a transfer to a community-based program before he or she can begin or complete the institution transitional services component, this component is not required); and
>
> ▪ the community transitional services, lasting up to six months when the inmate is transferred to a community corrections center or home confinement.

(Emphasis added). <u>See</u> also 28 C.F.R. § 550.56-59.

The Bureau's regulations specifically require that inmates complete all components of the RDAP program in order to be eligible for §3621(e)'s early release benefit, including the completion of "all applicable transitional services programs in a community-based program, (*i.e.*, in a Community Corrections or on home confinement)[.]" 28 C.F.R. § 550.58(a)(3)(i). <u>See</u> also 28 C.F.R. § 550.56 ("Inmates enrolled in a residential drug abuse treatment program shall be required to complete subsequent transitional services programming in a community-based program and/or in a Bureau institution.").

In September 2005, Petitioner was notified that he qualified to participate in the Bureau's

---

[2] In relevant part, Bureau Program Statements set forth the requirements of the Federal Regulations and explain Bureau policy. The full text of the Program Statements cited herein are available for review on the Bureau's website at www.bop.gov.

3

RDAP and that he was provisionally eligible for an early release under § 3621(e). (*Notice of RDAP Qualification and Provisional § 3621(e) Eligibility*, Docket No. 20, Ex. 4b). At some point, the Bureau notified him that his provisional early release date was October 6, 2008.

On September 26, 2005, Petitioner signed an agreement acknowledging that his early release date under § 3621(e) was provisional and that it may change. (*Agreement To Participate In RDAP*, Docket No. 20, Ex. 4a). He further acknowledged that he understood that if he was expelled from the RDAP he would lose his eligibility for early release consideration, and also that if he incurred an incident report he could be expelled from the RDAP. (Id. at 2-3).

### 2. Petitioner Is Transferred To a CCC and Begins the Final Phase Of the RDAP

On August 7, 2007, Petitioner signed an agreement to participate in community transitional drug abuse treatment ("T-DAT"), which is the third and final component of the RDAP. (*Agreement to Participate In Community Transition Program*, Docket No. 24, Ex. 6e). He acknowledged that he understood that expulsion from the program would result in loss of consideration for an early release under § 3621(e). (Id.) In April 2008, the Bureau transferred Petitioner to the CCC in Brooklyn, New York, which is located near his home. On April 21, 2008, he began the T-DAT program, which was provided by the Counseling Service of the Eastern District of New York ("CSEDNY").

Crystal Kindall is the Regional Transitional Drug Abuse Treatment Coordinator ("T-DATC") for the Bureau's Northeast Region. She is responsible for, among other things, placing inmates in T-DAT and for making treatment decision based on their individual needs. (See Kindall Decl. ¶¶ 6-8, Docket No. 20, Ex. 2; Hughes Decl. ¶ 4, Docket No. 20, Ex. 1; Program Statement 7430.02, Community Transitional Drug Abuse Treatment, Page 4). Ms. Kindall explains that the T-DAT program consists of group and individual substance abuse/dependence therapy, as well as psychiatric evaluations, and medication monitoring. (Id. ¶ 2). Its purpose is to provide inmates with substance abuse treatment during their period of transition back into the community, where they are exposed to greater access to drugs, alcohol and community stressors that could result in a relapse into substance abuse and/or criminality. (Id.) Ms. Kindall further explains that the T-DAT is a six month program that begins within ten days of an inmate's arrival to the CCC and continues

4

until the inmate is released from Bureau custody. (Id. ¶ 8).

### 3. Petitioner Obtains Outside Employment at Acapulco Rentals

The Bureau generally requires that inmates designated to a CCC obtain outside employment. (See Program Statement 7300.09, Community Corrections Manual, § 5.13.3). To promote financial responsibility and offset the cost of incarceration, the Bureau requires inmates to make subsistence payments to the CCC. The CCC collects "25% of each employed inmate's weekly gross income not to exceed the daily inmate-day rate." (Id. § 5.13.1). The Brooklyn CCC requires inmates to submit "*pay stubs* with proper deductions" as proof of employment and salary. (*Brooklyn CCC Fact Sheet*, Docket No. 24, Ex. 6b at 5 (emphasis added); see also Docket No. 24, Ex. 6b at 15 ("All employers must demonstrate withholding taxes on resident pay stubs, in order to ensure gainful employment."). When Petitioner was first admitted to the CCC, he signed an agreement acknowledging that he understood that he was required to abide by its rules. (*Community Based Program Agreement*, Docket No. 24, Ex. 6b at 13).

Soon after the Bureau transferred Petitioner to the Brooklyn CCC, he began working at Acapulco Rentals. According to Petitioner, Acapulco Rentals is a small business run by individuals whose primary language is Spanish. His manager there was Amanda Gallego. Petitioner states that on May 11, 2008, Ms. Gallego contacted Khari Prescod, an Employment Specialist at the Brooklyn CCC, and informed him that Acapulco Rentals was having problems with its accountant and that Petitioner would be paid in cash and would not receive a pay stub. Petitioner contends that Mr. Prescod told Ms. Gallego to provide Petitioner with a "verification letter" on company letterhead showing his hours worked, his gross and net pay, and the taxes withheld. Petitioner asserts that Mr. Prescod indicated that a verification letter would be an acceptable substitute to a pay stub and that Petitioner could submit the letter to the CCC when he turned in the paperwork for the processing of his 25% subsistence payments.

Petitioner has submitted to the Court copies of the verification letters that he provided to the CCC for the pay periods of May 11–May 17, 2008; May 26–May 31, 2008; and June 1–June 7, 2008. (Docket No. 1-3 at 12-14). The verification letters contain a line for Ms. Gallego's signature, but are unsigned. The letters also contain an obvious typographical error: Petitioner's weekly gross

5

salary is recorded as "$300,000," instead of "$300.00." In each letter Petitioner's net pay is properly shown as "$247.75." Petitioner also has submitted to the Court the receipts that he received when he turned in the verification letters to the CCC in May and in early June 2008. (Docket 1-3 at 11-14). The receipts indicate that on each occasion the verification letters were accepted by the CCC and a $75.00 subsistence payment was remitted by Petitioner.[3] (Id.)

On June 19, 2008, Petitioner was placed on home confinement. Dr. Gloria Gasper was his case manager. Petitioner contends that Dr. Gasper was "aware of the situation" with Acapulco Rentals and approved of his continued employment there. However, it appears that a breakdown in communication may have occurred between employees at the CCC and that Dr. Gasper was not aware of, or had not given her approval of, Petitioner's practice of submitting verification letters as proof of employment and salary in lieu of an actual pay stub.

### 4. Dr. Gasper Files an Incident Report

Consistent with his past practice, on July 14, 2008, Petitioner submitted verification letters from Acapulco Rentals for the pay periods of June 22 – 29, 2008 and June 30 – July 5, 2008. (Docket No. 24, Ex. 6b at 6-7). The next day, on July 15, 2008, Dr. Gasper lodged an Incident Report charging him with committing an infraction of Bureau Code 309 (violating conditions of the CCC) and Code 314 (counterfeiting, forging or unauthorized reproduction of any document). (*Incident Report*, Docket No. 24, Ex. 6b at 1-3). Dr. Gasper provided the following description of the alleged violations:

> On Monday, July 14, 2008, upon reviewing the pay stubs of Home Confinement Resident Marine, Damian reg. # 71304-004 from his place of employment at Acapulco Rentals Inc. … it was discovered that alterations were made to the pay stubs for the pay period of 6/22/08 – 6/29/08 and 6/30/08 – 7/05/08 (see attached) when resident Marine attempted to present them with a subsistence payment.
>
> Upon contacting resident Marine, Damian, Reg. # 71304-004, manager and contact person, Ms. Amanda Gallego, at Acapulco Rentals Inc., she expressed that due to a change in payroll, a pay stub was not submitted to resident Marine, Damien [sic] reg. # 71304-004 for pay period ending 6/29 and 7/5/08.

(Id. at 1, ¶ 11).

---

[3] Each receipt appears to have been signed by an individual whose first name is Rafael but whose last name is not legible to the Court.

6

On July 16, 2008, Petitioner went to the CCC and Assistant Operations Manager Derick Washington delivered the Incident Report to him at 3:54 p.m. (Id. at 1, ¶¶ 14-15). On that same day, United States Marshals transported him to the Metropolitan Detention Center in Brooklyn, New York ("MDC Brooklyn"). Investigative Specialist Gabriel Sylvester conducted the investigation of the incident. On July 21, 2008, he visited Petitioner at MDC Brooklyn and advised him of his rights. (Id. at 2, ¶ 23, & at 3). According to Petitioner, Mr. Sylvester told him that the Incident Report was issued because it appeared that the documentation that he had submitted was altered and erroneously showed that he had been paid $2,100 in cash. Mr. Sylvester referred the Incident Report to the Center Disciplinary Committee ("CDC") and instructed Petitioner that his disciplinary hearing would be held at MDC Brooklyn on July 25, 2008. (Id. at 3). He informed Petitioner that he was entitled to have a staff member represent him at the hearing, and Petitioner requested the assistance of Mr. Prescod. (Id.)

Petitioner's CDC hearing was held on July 25, 2008, before Chairperson Aykroyd Lake and Member Humbert Smith. Mr. Prescod appeared as Petitioner's staff representative. (*CDC Report* § II, Docket No. 24, Ex. 6b at 11). Petitioner denied the charges against him. The CDC summarized the statement he gave at the hearing as follows: "Although resident Marine admits to being paid in cash from his employer for the pay periods of 6/30 to 7/5/08, he stated that he did not alter any of the forms he presented to staff." (Id. § III.B).

At the conclusion of the hearing, the CDC determined that Petitioner had not violated Code 314 – counterfeiting, forging or unauthorized reproduction of any document. The CDC concluded, however, that Petitioner had committed an infraction of Code 309 – violating a condition of the CCC. The condition of the CCC that Petitioner violated was failing to submit a pay stub. The CDC relied upon the following evidence to support its findings: (1) "A copy of the community based program agreement"; (2) "A copy of the pay stubs without Manager's signature for pay periods 6/22/08 to 6/29/08 and 6/30 to 7/5/08"; (3) "Signed copy of Intake orientation"; and, (4) "A copy of letter from contact person/Manager of resident Marine['s] place of employment – Acapulco Rentals detailing that no pay stubs was given to resident and verifying that he was paid cash for the two pay periods in question." (*CDC Report* § V, Docket No. 24, Ex. 6b at 12; see also Docket No. 24, Ex.

7

6b at 4-7, 13-19). Motive for the violation was not at issue at the CDC hearing. (Surreply, Docket No. 24 at 6 n.5).

The CDC recommended that Petitioner be transferred to a more secure facility and that he lose at least 25% of any available good conduct time. On August 11, 2008, a Disciplinary Hearing Officer ("DHO") certified the CDC hearing. (*CDC Report* § X, Docket No. 24, Ex. 6b at 12). The Bureau transferred Petitioner to FCI McKean and he lost 13 days of good conduct time.

On August 25, 2008, Petitioner appealed the CDC's decision to the Bureau's Northeast Regional Office. (*Regional Office Administrative Remedy Appeal*, Docket No. 24, Ex. 6a at 1-2). He contended that Dr. Gasper improperly allowed the Incident Report to proceed against him after Ms. Gallego had provided clarification to her about the documentation Acapulco Rentals gave to him to verify his employment and salary. Petitioner also complained that he had not been provided with copies of the verification letters that he had submitted to Dr. Gasper for the pay periods of June 22-29, 2008 and June 30-July 5, 2008 (which were the subject of the Incident Report). On September 8, 2008, Petitioner supplemented his Regional Administrative appeal by submitting an unsworn statement from Ms. Gallego.[4] She stated that "supervisors" at the CCC were aware that Acapulco Rentals could not provide Petitioner with a pay stub and that the CCC had "evidently accepted" Petitioner's continued employment there as long as he submitted a verification letter. Ms. Gallego stated that the secretary at Acapulco Rentals prepared the verification letters and that if a letter showed that Petitioner had been paid $2,100, that was an error and the correct amount paid was $210.00. (See Gallego Decl., Docket No. 13 at 1-2).

### 5. The Bureau Rescinds Petitioner's Provisional Early Release Date

In the meantime, Petitioner was discharged from the T-DAT. (See *CSEDNY Community Treatment Discharge Summary*, Docket No. 20, Ex. 2b).[5] On July 28, 2008, Ms. Kindall submitted

---

[4] Ms. Gallego's statement was written in Spanish and Petitioner submitted his own English translation.

[5] The discharge summary indicated that when Petitioner began his outpatient treatment, several areas of concern for recovery were identified, including marijuana, alcohol, and cocaine dependence; the lack of a sober support network; and the inability to attend 12 step meetings. (*CSEDNY Community Treatment Discharge Summary*, Docket No. 20, Ex. 2b). The summary also indicated that:

(continued...)

8

a request to the Bureau's Designation and Sentence Computation Center that Petitioner's § 3621(e) provisional early release date be removed because he could not fulfill the requirements of T-DAT. (*Request For Delay Or Removal Of Early Release*, Docket No. 20, Ex. 3b). She gave two reasons to support the requested action. First, Ms. Kindall explained that as a result of the Incident Report and the CDC hearing, Petitioner was deemed a "CCC failure." (Id.) Second, she explained that Petitioner's "behavior indicates that he has failed to benefit from treatment" and he was deemed a "T-DAT Program Failure." (Id.)

As a result of Ms. Kindall's request, the Bureau rescinded Petitioner's provisional early release date of October 6, 2008 and recalculated the date his sentence would expire. Without § 3621(e)'s early release benefit (and without the 13 days of good conduct time that Petitioner had lost as a sanction after the CDC hearing), Petitioner's 57-month was set to expire on July 1, 2009. (See *Sentence Monitoring Computation Data as of 9-16-08*, Docket No. 1-3 at 2).

### 6. Petitioner's Regional Administrative Appeal Is Denied

On September 26, 2008, the Northeast Regional Director, D. Scott Dodrill, denied Petitioner's appeal of the CDC's decision. (*Regional Administrative Appeal Response*, Docket No. 24, Ex. 6a at 3). Mr. Dodrill held that "[t]he record in this case reflects substantial compliance with Program Statement 5270.07, Inmate Discipline. The decision of the CDC was based upon the greater weight of the evidence, and the recommended sanctions, upheld be the DHO, were consistent with the severity level of the prohibited act." (Id.) Mr. Dodrill did not mention Ms.

---

[5](...continued)
Mr. Marine was in [T-DAT] treatment for a short time, approximately three months before being remanded [from the Brooklyn CCC supervision / home confinement]. He remained mistrustful about sharing personal information and unable to fully trust the process. He completed activities in group, minimally and required prompting. In individual session he was beginning to explore his behavior in regards to his mental health issues. Mr. Marine was seen monthly for psychiatric follow up care by CSEDNY psychiatrist. He was prescribed Prozac 60 mg to manage symptoms associated with his diagnosis of Obsessive-compulsive disorder. He reported compliance with psychotropic medication. Client maintained fairly good attendance and punctuality to all scheduled appointments to treatment. He received one infraction for arriving late once to individual session. It is strongly being recommended that client upon his release continue attending substance abuse treatment while on Supervised release status. Mr. Marine still has certain issues that he needs to continue addressing to increase his changes of sustaining a pro-social lifestyle in the future. Mr. Marine should be seen for mental health follow up care.

(Id.)

Gallego's September 2008 statement (perhaps because the issue before him was whether the CDC's decision was supported by the greater weight of the evidence admitted at the July 25, 2008 disciplinary hearing). In response to Petitioner's complaint that he did not receive copies of the verification letters at issue, Mr. Dodrill explained that there was no indication that Petitioner had not been made aware of the content of those letters at the CDC hearing. He advised Petitioner that if he wanted a copy of the letters he could file a Freedom of Information Act request with the Bureau's Office of General Counsel. (Id.)

On October 6, 2008, Petitioner submitted an appeal to the Bureau's Central Office. (Docket No. 24, Ex. 6a at 4). Pursuant to Bureau regulations, the Central Office's response to Petitioner was due within 40 days (on or before November 23, 2008). 28 C.F.R. § 542.18. (See also *10/21/08 Receipt–Administrative Remedy*, Docket No. 13 at 7). On November 18, 2008, the Central Office notified Petitioner that it needed additional time to respond to his appeal and that it would issue its response on or before December 13, 2008. (*11/18/08 Extension Of Time For Response*, Docket No. 13 at 8). Pursuant to the Bureau's regulations, the Central Office is permitted to extend its response deadline one time by 20 days. 28 C.F.R. § 542.18.

### 7. Petitioner Files His Federal Habeas Petition

The Central Office did not respond to Petitioner's appeal by the December 13, 2008 deadline.[6] By that point, Petitioner had filed his petition for writ of habeas corpus with this Court. (Docket No. 1-2). He contended that there was insufficient evidence to support the CDC's decision. Some of Petitioner's allegations were similar to those that he had made in his administrative appeal, but he also made broader allegations. Specifically, in his petition for writ of habeas corpus, he claimed that he had not been made aware that the July 25, 2008 CDC hearing was actually a disciplinary hearing (he described it as an "informal prison visit"); that he had not received a copy

---

[6] There is no evidence of bad faith on the part of the Central Office. When it fails to file a timely response, an inmate is relieved from waiting any further for a decision from it before he seeks federal habeas corpus relief in a district court. That is because "if the inmate does not receive a response [from the Central Office] within the time allotted for reply, including extension, the inmate may consider the absence of a response to be a denial [of the appeal.]" 28 C.F.R. § 542.18. Thus, after December 13, 2008, Respondent was precluded from arguing to this Court that Petitioner had not yet fully exhausted his administrative challenge *to the CDC's decision*.

of the Incident Report or notification of the charges against him; and, that he had not been advised of his rights.[7]  As relief, he sought: (1) expungement of the Incident Report; (2) immediate release from Bureau custody; and, (3) the termination of his 3-year term of supervised release.  Petitioner also filed a motion for an injunction in which he requested his immediate release from Bureau custody.  (Docket No. 7).

On January 6, 2009, the Court conducted a hearing on the injunction motion at which Petitioner and counsel for Respondent participated by telephone.  Counsel for Respondent informed the Court that she had contacted the Bureau's Central Office and had inquired about why Petitioner had not received a timely response to his administrative appeal.  (1/6/09 Motion Hearing Tr. at 8-9, Docket No. 21).  The Court directed Respondent to file a Response to the petition no later than February 5, 2009, and explained that the petition and the pending motion would be ruled upon once a Response was filed.  (Id. at 13-14).

### 8. The Central Office Grants Petitioner's Appeal Of His Disciplinary Proceeding

On January 26, 2009, Petitioner filed another motion for immediate release.  (Docket No. 17).  He attached to this motion the Central Office's response to his administrative appeal, which was issued on January 15, 2009.  In that response, Harrell Watts, Administrator, National Inmate Appeals, stated:

> You appeal the July 25, 2008, decision of the Center Discipline Committee (CDC), in which you were found to have committed the prohibited act of Violating a Condition of a Community Program (code 309).  You request expungement of the incident report.
>
> We find merit to the issues raised in your appeal.  Accordingly, your appeal is being returned to the institution for appropriate action.  Your appeal is granted.

(Docket No. 17 at 3).

### 9. Respondent Moves To Dismiss The Petition

Next, on February 4, 2009, Respondent filed a Response and/or Notice of Suggestion of Mootness.  (Docket No. 20; see also Surreply, Docket No. 24).  Respondent explains that in

---

[7] These allegations are not supported by the record before the Court.  (See *Incident Report*, Docket No. 24, Ex. 6b at 1-3; *CDC Report*, Docket No. 24, Ex. 6b at 11-12).

accordance with the Central Office's January 15, 2009 decision, the Bureau has expunged the Incident Report and restored to Petitioner the 13 days of good conduct time. Petitioner has been transferred back to the Brooklyn CCC. Once he has established positive adjustment to the CCC, he will be considered to placement on home confinement. With the restoration of the 13 days of good conduct time, Petitioner's sentence is set to expire on June 20, 2009. (*Inmate Data*, Docket No. 20, Ex. 1a at 3-4).

Respondent asserts that Petitioner's request for expungement of the Incident Report must be dismissed as moot. Respondent also asserts that Petitioner's additional requests for relief must be dismissed for being without merit. Regarding Petitioner's request for immediate release, Respondent explains that a new early release date under § 3621(e) does not automatically follow the expungement of the Incident Report. (Program Statement 5330.10, Drug Abuse Treatment Manual, Chapt. 6 at Page 13; Kindall Decl. ¶¶ 2-8, Docket No. 20, Ex. 2). That is because pursuant to Bureau regulations and policy, Petitioner *must complete the T-DAT program* before he is entitled to early release under § 3621(e). 28 C.F.R. § 550.58(a)(3)(i); id. § 550.56. (See also Kindall Decl. ¶¶ 2-8, Docket No. 20, Ex. 2). Because Petitioner has not completed the T-DAT program, immediate release from Bureau custody is not available to him.

Respondent explains that when Petitioner's Incident Report was expunged, the Bureau was presented with two options. First, it could have permitted Petitioner to resume the T-DAT at the phase at which he had progressed at the time he was removed from the program on July 16, 2008. Under this scenario, Petitioner would be credited with already having completed approximately 3 months of the T-DAT's program. Second, the Bureau could have decided that Petitioner must re-start the T-DAT's six-month program. Under this scenario, it would not be possible for Petitioner to complete the T-DAT program before his June 20, 2009 release date, and thus he would not be eligible for an early release under § 3621(e). (Kindall Decl. ¶¶ 4-8, Docket No. 20, Ex. 2). The Bureau chose the second option. Therefore, Petitioner will remain in Bureau custody and will continue to participate in the T-DAT (either in the CCC or on home confinement) until June 20, 2009. This decision was made by Ms. Kindall as part of her duties as the T-DATC for the Northeast Region, after she received notification that the Incident Report had been expunged and

12

that Petitioner would be transferred back to the CCC. (Id. ¶¶ 6-8).

In her Declaration, Ms. Kindall explained her decision as follows:

7. My review of inmate Marine's T-DAT file indicates the following pertinent information:

(a) On April 21, 2008, he was admitted to the [CSEDNY]. He completed the initial intake and diagnoses assessment, the psychiatric evaluation, and he was scheduled for monthly monitoring.

(b) He attended group therapy sessions for two hours weekly, and he was seen monthly for individual sessions;

(c) He was in T-DAT approximately three months before he was remanded to a secure institution, and discharged from T-DAT.

(d) During his participation in T-DAT, his presentation in group therapy was reserved, guarded and secretive. He remained distrustful about sharing personal information and he was unable to fully trust the process;

(e) He completed activities in group minimally, and required prompting over the course of three months.

(f) He was seen monthly for psychiatric follow-up care by a CSEDNY psychiatrist. He was prescribed Prozac 60 mg to manage symptoms associated with his diagnosis of obsessive compulsive disorder. He reported compliance with psychotropic medication.

(g) He maintained fairly good attendance and punctuality to all scheduled appointments to treatment.

(h) He received one infraction for arriving late for an individual treatment session. Due to his tardiness, he was not admitted for the session and missed the treatment session.

(i) It was strongly recommended that upon his release, he continue attending substance abuse treatment while on supervised release.

8. [Petitioner's] last participation in T-DAT was July 2008.… [T]he T-DAT community-based treatment specialists felt he has a strong need for continued substance abuse treatment, and he participated in T-DAT for only three months prior to his removal from T-DAT. He was discharged from the treatment agency. Given the lapse in treatment, more than six months, he must be readmitted and reevaluated. The T-DAT treatment cannot simply resume from the point he attained prior to his removal. It must also be noted that he was afforded the opportunity to participate in the [RDAP]. RDAP's treatment regimen is based on daily group therapy sessions. Yet, during the final phase of treatment, T-DAT, inmate Marine participated minimally and had to be prompted to participate in group treatment sessions. Inmates must complete all phases of the program, the institution based treatment program, RDAP, and T-DAT to receive the benefit of a sentence reduction. My opinion is that it is in inmate Marine's best interest and he would benefit most be starting the program anew. Because T-DAT is a six month program for RDAP graduates that begins within 10 days of the inmate's arrival to the community and continues until the inmate is released from Bureau of Prisons custody, inmate Marine

13

does not have enough time remaining on his sentence to receive an early release benefit. The purpose of the Bureau of Prisons drug abuse treatment program is treatment of substance abuse and or substance dependence, and reduction of criminality. Although it is recognized that the Incident Report which resulted in his removal from the RRC and T-DAT was expunged, the determination to re-start him in T-DAT upon his return to the RRC is not a disciplinary action, and it is based solely upon the therapeutic goals of the T-DAT.

(Id. ¶¶ 7, 8).

On February 11, 2009, Petitioner filed a Reply in which he has included a request for compensation for emotional damages. (Docket No. 22). Respondent filed a Surreply on February 19, 2009, (Docket No. 24), and Petitioner filed a Response To Surreply on March 16, 2009 (Docket No. 28).

**B.    Discussion**

### 1.    Petitioner's Request To Have His Incident Report Expunged Is Moot

Respondent correctly contends that Petitioner's request for expungement of the Incident Report is moot because the Bureau has already provided him with that relief. See, e.g., Spencer v. Kemna, 523 U.S. 1, 18 (1998) ("[M]ootness, however it may have come about, simply deprives us of our power to act; there is nothing for us to remedy, even if we were disposed to do so."); Burkey v. Marberry, 556 F.3d 142, 147 (3d Cir. 2009) ("Under Article III of the Constitution, a federal court may adjudicate 'only actual, ongoing cases or controversies.' … Article III denies the District Court the power to decide questions that cannot affect the rights of litigants before it[.]") (citations omitted)).

### 2.    Petitioner Is Not Entitled To Immediate Release

The question now presented by the petition is whether the Court has the authority to order the Bureau to immediately release Petitioner from it custody, as he requests. In resolving this question, the Court must first address Respondent's assertion that Petitioner has not exhausted this claim because he did not file an administrative appeal challenging the revocation of his provisional early release date upon Ms. Kindall's July 28, 2008 request (see *Request To Delay Or Remove Early Release Date*, Docket No. 20, Ex. 3b), and also because he failed to file an administrative appeal to her recent decision that he re-start the T-DAT program, which now makes him ineligible to receive

any early release benefit under § 3621(e). See 28 C.F.R. § 550.60 ("Administrative remedy procedures for the formal review of a complaint relating to any aspect of an inmate's confinement (including the operation of the drug abuse treatment programs) are contained in 28 part CFR 542, subpart B. In order to expedite staff response, an inmate who has previously been found to be eligible for early release must, when filing an administrative remedy request pursuant to 28 CFR part 542, subpart B on an action which would result in the inmate's loss of early release eligibility, indicate in the first sentence of the request that the request affects the inmate's early release."). (See also Program Statement 7430.02, Community Transitional Drug Abuse Treatment, Page 7 (If an inmate is removed from T-DAT treatment due to disciplinary proceedings, he must challenge the loss of early release eligibility by filing an administrative remedy request. "In order to expedite staff response, an inmate … must … indicate in the first sentence of the request that the request affects the inmate's early release.").

Although 28 U.S.C. § 2241 contains no statutory exhaustion requirement, a federal inmate ordinarily may not challenge the Bureau's execution of his sentence until he has exhausted all available administrative remedies. See, e.g., United States v. Wilson, 503 U.S. 329, 334-35 (1992); Moscato v. Federal Bureau of Prisons, 98 F.3d 757 (3d Cir. 1996); 28 C.F.R. § 542, Subpart B. Petitioner asserts that he completed the exhaustion process and cites to the administrative appeal that he filed seeking expungement of the Incident Report. He argued in that administrative appeal that the Incident Report should be expunged and that he should be returned to the CCC. He did not raise the argument that his provisional early release date under § 3621(e) was improperly revoked. (See *Administrative Appeals*, Docket No. 24, Ex. 6a). Moreover, it is not disputed that he has not filed an administrative appeal challenging Ms. Kindall's recent decision that he must re-start the T-DAT. Accordingly, Petitioner failed to properly exhaust any claim that the Bureau improperly revoked his § 3621(e) early release date.

It may be, however, that Petitioner did not understand that a successful administrative appeal of the CDC's decision would not result in the restoration of his provisional early release date of October 6, 2008. Nevertheless, even if the Court were to excuse Petitioner from the exhaustion requirement, he still would not be entitled to immediate release.

A district court may only extend the writ of habeas corpus to an inmate if he demonstrates that "[h]e is in [Bureau] custody in violation of the Constitution or laws of the United States." 28 U.S.C. § 2241(c)(3). Petitioner has not met this burden. There was no ambiguity that his early release eligibility was provisional and conditioned upon several factors, including his successful completion of T-DAT. He had no liberty interest in a sentence reduction under § 3621(e). See Richardson v. Joslin, 501 F.3d 415 (5th Cir. 2007) (there is no liberty interest in a sentence reduction under § 3621(e); the denial of a sentence reduction would only cause an inmate to serve the remainder of his sentence under typical circumstances rather than imposing a punishment qualitatively different from the punishment characteristically suffered by a person convicted of a crime; and, the statute is discretionary) (citations omitted); see also Rublee v. Fleming, 160 F.3d 213, 217-18 (5th Cir. 1998). Moreover, the Bureau is charged with administering § 3621(e), see generally Lopez v. Davis, 531 U.S. 230, 235 (2001), and the Bureau requires that inmates must *complete* T-DAT treatment in order to be eligible for early release under § 3621(e). See 28 C.F.R. § 550.58(a)(3)(i); id. § 550.56. (See also Kindall Decl. ¶ 8, Docket No. 20, Ex. 2; Program Statement 5330.10, Drug Abuse Programs Manual, Chapt. 6, Pages 1-3, 12-14). That requirement is a valid exercise of the BOP's discretion under § 3621(e) and this Court must defer to it. See, e.g., McLean v. Crabtree, 173 F.3d 1176, 1180-84 n.5 (9th Cir. 1999) (collecting cases) (regulation requiring participation in and completion of T-DAT is entitled to deference under Chevron, U.S.A. v. Natural Res. Def. Council, 467 U.S. 837 (1984)); Rublee, 160 F.3d at 214-17. Finally, once Petitioner's Incident Report was expunged and the Bureau ordered that he be transferred back to the CCC, it was within Ms. Kindall's discretion to determine whether he should re-start the T-DAT program, and this Court has no authority to review her decision. 28 U.S.C. § 2241(c)(3). Habeas relief is available in this case only if Petitioner were to show a violation of the Constitution or federal law, not merely that he disagrees with a Bureau decision that is within its discretion to make. Id.; see Marshall v. Lansing, 839 F.2d 933, 949-50 (3d Cir. 1988).

The Court is not without sympathy to Petitioner's situation. The Bureau's Central Office granted his administrative appeal and overturned the CDC's decision. Had the CDC found that he had not violated Code 309 in the first place, his sentence would have expired on his provisional

release date of October 6, 2008, provided of course that he successfully completed T-DAT by that date and the early release benefit was not subsequently revoked for other reasons, see Program Statement 5330.10, <u>Drug Abuse Programs Manual</u>, § 6.5 *Loss of Provisional Early Release*; § 6.7 *Monitoring Provisional Early Release While In a Community-based Program*; § 6.7.2 *Delaying Early Release For Unresolved Disciplinary Conduct*; and § 6.7.2 *Reducing the Early Release Benefit*. Unfortunately for Petitioner, this Court has no authority to order the Bureau to immediately release him from its custody. His sentence expires on June 20, 2009 and he will be released from Bureau custody on that date to his term of supervised release.

### 3. Petitioner's Additional Requests For Relief Must Be Denied

Petitioner also seeks an order from this Court directing that his 3-year term of supervised release be terminated and that he be awarded compensatory damages for emotional distress. Only the sentencing court (here, the District Court for the Southern District of Florida) has the authority to modify the term of supervised release, and therefore Petitioner's request that this Court terminate his supervised release must be denied. 18 U.S.C. § 3583(e); <u>see</u> <u>also</u> <u>Burkey</u>, 556 F.3d at 146 n.3 (citing <u>Gozlon-Peretz v. United States</u>, 498 U.S. 395, 400-01 (1991); <u>United States v. Lussier</u>, 104 F.3d 32, 34-35 (2d Cir. 1997)). Because money damages are not available in a habeas corpus action under 28 U.S.C. § 2241, his request for emotional distress damages must be denied as well. <u>See</u> <u>Preiser v. Rodriguez</u>, 411 U.S. 475, 494 (1973) (explaining that "if a state prisoner is seeking damages, he is attacking something other than immediate or more speedy release-the traditional purpose of habeas corpus. In the case of a damages claim, habeas corpus is not an appropriate or available federal remedy."); <u>McKinney-Bey v. Hawk-Sawyer</u>, 69 Fed. Appx. 113 (4th Cir. 2003) (money damages are not available under 28 U.S.C. § 2241; an action for monetary damages is properly pursued by way of a civil rights action).

## C. Certificate of Appealability

Section 102 of the Antiterrorism and Effective Death Penalty Act (28 U.S.C. § 2253 (as amended)) codified standards governing the issuance of a certificate of appealability for appellate review of a district court's disposition of a habeas petition. Federal prisoner appeals from the denial

of a § 2241 habeas corpus proceeding are not governed by the certificate of appealability requirement. United States v. Cepero, 224 F.3d 256, 264-65 (3d Cir. 2000); 28 U.S.C. § 2253(c)(1)(B).

### III.   CONCLUSION

For the foregoing reasons, it is recommended that the Petition for Writ of Habeas Corpus be denied. In accordance with 28 U.S.C. § 636(b)(1)(B) and (C), and Local Rule 72.1.4(B), the parties are allowed 10 days from the date of service to file written objections to this Report and Recommendation. Any party opposing the objections shall have 7 days from the date of service of objections to respond thereto. Failure to file timely objections may constitute a waiver of any appellate rights. See Nara v. Frank, 488 F.3d 187 (3d Cir. 2007).


        S/ Susan Paradise Baxter
        SUSAN PARADISE BAXTER
        Chief U.S. Magistrate Judge


Dated: April 3, 2009